Nelsoít, J.,
delivered the opinion of the Court.
This is an action of tort, brought by the plaintiff against the ten defendants named in the record, under the Code, § 2746, for the wrongful taking of one bureau, one press, one bedstead, one trunk, one side-saddle, and various other articles of personal property. The declaration was filed in accordance with form No. 18, § 2939. The defendants severally pleaded not guilty; and the defendant, William S. Eeynolds, in addition to the plea of not guilty, gave notice “to the plaintiff's attorney," that, on trial, he would insist:
1st. That he did not take the several articles of personal property mentioned in the declaration; and
2d. That whatever articles he did take, were taken into his possession by authority duly vested in him, as the special Assistant Agent of the Treasury Department of the United States, and to and for the use of the Government of the United States.
It appears from the record that, at April Term, 1867, a demurrer was sustained to the plea and notice of William S. Eeynolds, and leave granted to amend and to plead over; but no demurrer is set out. At the August Term, 1870, the plaintiff moved that the said notice of defense attached to the plea of William S. Eeynolds should be stricken out as insufficient, but the Court overruled the motion.
*212 It appears, in evidence, that the plaintiff was the owner of the property mentioned in the declaration; that she resided in Anderson County before and until the month of September, 1863; that, in consequence of threats made against her, and “some people cutting her house partly down,” on the previous night, she removed about twenty miles distant, to Campbell County; that she did not remove secretly, but “told any one that asked her where she was going;” that she resided openly and publicly in the county to which she removed, and occasionally visited her former residence; that, before she changed her domicile, she made what the witnesses call “a sham sale” of the property sued for, to one James Hale, for the purpose of preventing her property from being taken or destroyed, but with the understanding that she was to have it back whenever she returned, and that Hale was to keep it for her until she wanted it. Hale, who was examined as a witness for the defendant, states that he did not claim the property at any time; that he never paid anything, and that plaintiff returned the note that he executed for the property.
It further appears, that the plaintiff never took up arms against the United States; but there is some conflict in the testimony as to her political opinions. One witness states that the plaintiff had the reputation of being “disloyal;” another, that she was a “rebel by report,” that he saw her shout and clap her hands when ■Wheeler’s raid passed along in August, 1864, but did not know “what she clapped and shouted for.” On the contrary, three witnesses, one of whom lived with the plaintiff, state they are well acquainted with her, *213 and never knew her to do any act giving aid, comfort or encouragement, to the rebellion.
It further appears, that the defendant, ¥m; S. Reynolds, claiming to have authority from the Agency Aid at Knoxville, Tennessee, of the the United States Treasury Department, to take possession of all abandoned rebel property in Anderson County, seized the property in controversy, and sold it at public sale, about the month of June, 1864; that he and one Keslin, conducted the sale; that his co-defendants became purchasers of the property; and that, on the day of sale, and before its removal, the plaintiff appeared in person and forbade the purchasers to remove the property, and stated that they would have to account for the property, or the value of it, “ some day,” and some of the ■purchasers, who are not sued, declined, in consequence, to remove the articles they bought at the sale. It is also stated by one witness, who is not contradicted, that when the plaintiff appeared on the day of sale, and claimed the property, she “asked the defendant, Reynolds, for his authority for selling her property, and Reynolds told her he would see her in hell before he would show her any authority, or any other rebel.”
These are the most material facts appearing in the record. Verdict and judgment were rendered for the defendants, and the plaintiff appealed in error to this Court. Various questions of law are presented by the record and in argument.
1. It is provided in the Code, §§ 2913-2917, that the defendant may enter a general denial of the plaintiff’s cause of action, equivalent to the general issue *214 heretofore in use; that 'when, such general plea is filed, he shall give notice of all his real defenses, whether by way of denial or avoidance, though such defense might have been admissible heretofore, under the general issue; that no matter of defense, of which notice is not given, shall be relied on; that the notice shall state such defenses sej>arately; and if the same are not stated clearly, or are double or insufficient, they may be struck out on motion; or he may plead specially his defenses, in which case he shall state the facts relied on, truly and briefly as may be, and no matter of defense not pleaded, shall be shown in evidence.
In the case of West v. Tylor, 2 Cold., 101, it was held by this Court, that a notice of special matters of defense ‘‘should be as certain, sufficient and eflective, for all purposes, as the special plea provided by § 2916.”-Under the English statutes of set-off, which allowed notice of cross demands, it was held' that the notice should be almost as certain as a declaration; 1 Chit. Pl., 575, marg; 1 Selw. N. P., 136, note 102, 4th Am. ed. A similar practice prevailed under our statute of set-off of 1756, c. 4, s. 7, Car. & Nich. And in this case, we are of opinion that the matter of justification relied upon in the notice, is defectively stated, in this, that it does not aver what articles were taken by the defendant, or so. describe the authority under which he acted, as to inform the plaintiff of the real nature of the defense; and it was error in the Court helow, to overrule the motion to strike out the notice for insufficiency.
2. The Court erred in permitting witnesses to prove *215 the so-called “disloyalty” of the plaintiff, by reputation, the evidence having been objected to when offered. It has long been well settled that the hearsay evidence of reputation is admissible only in questions of boundary, pedigree, and the like, and that in civil suits, evidence as to general character is not admitted, unless the nature of the action involves the general character of the party, or goes directly to affect it. 1 Greenl. Ev., 54. If the plaintiff had any political status, and it was necessary to inquire into it, with a view to the attempted justification, it should have been proved, not by hearsay or general reputation, but by her acts or declarations.
3d. On the supposition that the evidence was sufficient to establish the fact that William S. Reynolds was an assistant special agent of the Treasury Department, which is not by any means clear, as it rests, in part upon the hearsay evidence of a declaration made by the Secretary of the Treasury, we hold that his Honor, the Circuit Judge, erred in his instructions to the jury, as to what constituted abandoned rebel property. In section 1 of the Act of Congress, approved March 12, 1863, 12 U. S. Statutes at Large, /820, c. 120, the Secretary of the Treasury was authorized to appoint “a special agent or agents to receive and collect all abandoned or captured rebel property in any State or Territory of the United States, designated as in insurrection against the lawful Government of the United States, by the proclamation of the President, of July 1st, 1862,” with certain exceptions as to property used, or intended to be used for the purpose of waging or carrying on war. Section 2 authorizes *216 the property seized or collected by the agents to be appropriated to public use, on due appraisment and certificate, or to be forwarded to any place of sale within the loyal States, as the public interests may require. The right to receive and collect abandoned property does not, under said Act, depend upon the character or the loyalty, or disloyalty of the owner; but in section 3, it is provided that “ any person claiming to have been the owner of any such abandoned or captured property, may, at any time within two years after the suppression of the rebellion,- prefer his claim to the proceeds thereof, in the Court of Claims, and on proof to the satisfaction of said Court of his ownership of said property, of his right to the proceeds thereof, and that he has never given any aid and comfort to the present rebellion,” may receive the residue of such proceeds after “ certain deductions” specified in said section.
In his circular of July 3, 1863, to the Supervising Special Agents, the Secretary of the Treasury discriminates between abandoned, captured, commercial and confiscable property, and defines the first to be of two descriptious ; First, that which has been deserted by the owners; and Second, that which has been voluntarily abandoned by them to the civil or military authority of the United States. The same definition is repeated in the “Regulations” prescribed by athe Secretary of the Treasury 'for the government of the several special agents and agency aids, appointed in pursuance of the said Act of. 12th of March, 1863, and promulgated on the 11th of September, 1863, page 31, and in his Rules and Regulations concerning commercial intercourse, tand abandoned, captured *217 and confiscable property, page 31, promulgated July 30th, 1864. And in the second and third sections of the Act approved July 2d, 1864, it is declared that “property, real or personal, shall be regarded as abandoned when the lawful owner thereof shall be voluntarily absent therefrom, and engaged, either in arms or otherwise,' in aiding or encouraging the rebellion.” The said third section declares, among other things, that the Act approved March 12th, 1863, is hereby extended, so as to include the descriptions of property mentioned in the Act approved July 17, 1862, to suppress insurrection, etc. 13 U. S. Stat. at Large, 376. And, by section 7, of the said last-named Act, it is provided that the property, real and personal, which is subject to confiscation under section 6, shall be subject to condemnation and sale by proceedings to be instituted in the District Courts of the United States, “whenever the same shall be found to have belonged to a person engaged in rebellion, or who has given aid or comfort thereto.
The evidence contained in the record does not make out a case of abandonment within the meaning of either of these definitions. It does not show that the plaintiff was engaged in rebellion, either in arms or otherwise, or that she gave aid and comfort to those who were so engaged; and, although it does not clearly appear whether her property was seized and sold before or after the passage of the Act of July, 1864, yet, as the Act was passed upon the same general subject, and refers to all the previous Acts, it may be properly looked to for the purpose of ascertaining the meaning' of terms employed in the prior Act. And in no pos *218 sible sense of all, or either, of said statutes, can the plaintiff be regarded as having abandoned her property, if she left it in the care of another person, resided publicly in an adjoining county, and revisited her former residence before the alleged seizure, and was not engaged in arms or otherwise, in encouraging the rebellion. The charge of the Circuit Judge, that “abandoned property, in the purview of the law of Congress, is property owned by rebels, and which they abandon, go away and leave, abscond from, and are not present to protect it or claim it as their own, this absence being in consequence of the original owner having given aid, encouragement or assistance to those engaged in arms against the United States,” was founded in error, and well calculated to mislead the jury. So, also, the instructions of his Honor, that “ the property can not be said to be abandoned, unless you believe it was intended that the person in whose possession the property was placed, should hold it for the purpose of defrauding the government, by avoiding the Act of Congress in regard to abandoned property,” is in conflict with the principles declared in Galbraith v. McFarland, 3 Cold., 267, and seems, moreover, erroneously to imply that a purpose to defraud the government, is synonymous with abandonment. Again: his Honor erred in stating to the jury, that, if the property was seized and sold as abandoned property, and the circumstances under which it was left by the owner were such as to jnduce a reasonable, prudent man to believe it was abandoned, the plaintiff can not recover in this action.” If a sheriff arrests a person not named in his writ, or *219 seizes goods not belonging to the defendant in an execution, he acts at' his peril, and it is no justification that he acted under a mistake. The seizure of property under the Acts of Congress referred to by an “Agency Aid,” or “Assistant Special Agent” of the Treasury Department, can be justified only by the fact, and not by the supposition, of abandonment.
' There are other errors, both in the proceedings and in .the charge of the Circuit Court, which are not here considered, as in any event, the judgment in this case must be reversed, and a new trial awarded.
Upon the questions so elaborately and ably argued by the counsel for the plaintiff in error, as to the unconstitutionality of the Acts of Congress above referred to, and as to what constitutes aid and comfort, within' their true import and meaning, it is not deemed necessary to announce an opinion. Grave doubts have been expressed upon these topics, by some of the ablest legal minds, but as they involve a wide latitude of investigation, and the exigencies of this case do not require that they shall be considered, we have preferred simply to construe so much of the statutes as seems necessary •without expressing any opinion as to their constitutionality.
Let the judgment be reversed, and the cause remanded.